HOBOKEN LAND AND IMPROVEMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 102779, 103902.   Promulgated March 10, 1942.

*John Enrietto, Esq.*, and *Lee I. Park, Esq.*, for the petitioner.
*Dean P. Kimball, Esq.*, for the respondent.

OPINION.

SMITH: These proceedings consolidated for hearing, are for the redetermination of deficiencies in income tax for the years 1934, 1936, and 1937 as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 102779 | { 1936<br>1937 | $10,969.91<br>14,079.43 |
| 103902 | 1934 | 19,099.73 |

There are four principal issues, which will be treated separately. Briefly stated they are as follows:

(1) Whether petitioner is entitled to deductions for depreciation on certain piers and waterfront properties for the years 1934, 1936, and 1937.

(2) Whether a deduction for accrued property taxes taken in the year 1934 should be adjusted in the light of the subsequent abatement of taxes or whether such abatement and a similar abatement of taxes deducted from gross income in the return for 1933 should be treated as taxable income of the petitioner for 1936.

(3) Whether petitioner is entitled to a capital loss which it asserts it sustained as a result of the liquidation of the First National Bank of Hoboken, New Jersey, in the year 1934.

(4) Whether the petitioner is entitled to deductions for losses and bad debts on account of certain assets disposed of or charged off which it had previously acquired from the First National Bank of Hoboken, New Jersey.

At the hearing of these proceedings the petitioner waived a claim to the deduction of taxes accrued during the year 1937.

The issues stated above will be treated separately herein. The written stipulation of facts filed by the parties is incorporated herein by reference as our findings of fact.

The petitioner is a corporation organized under the laws of the State of New Jersey. Its office and principal place of business is Hoboken, New Jersey. Its returns for the taxable years involved were filed with the collector of internal revenue for the fifth district

of New Jersey. The petitioner kept its books and records and filed its income tax returns on the accrual basis of accounting.

## Issue 1.—Depreciation.

The petitioner claims deductions for depreciation on "Piers and Waterfront Properties" for the years 1934, 1936, and 1937 in the amounts of $66,849.56, $66,913.48, and $66,977.40, respectively. The respondent determined that in years prior to 1934 the petitioner had recovered through depreciation allowances the full cost of the depreciable assets included in "Piers and Waterfront Properties" and accordingly was not entitled to any depreciation allowances in respect of them for the taxable years before us. The petitioner contends that the "excess" depreciation allowed in the earlier years was allowed on land and that it is not permissible to allocate it against the unexhausted basis of buildings and structures, as respondent seeks to do. The years in which such excess deductions were taken are now closed by the running of the statute of limitations.

In amended answers which were filed at the hearing the respondent pleads that the petitioner is now estopped to deny that the properties in question were fully depreciated prior to the year 1934. The respondent's plea of estoppel was duly placed in issue herein by the petitioner's replies to the amended answers.

On December 31, 1933, petitioner owned certain properties carried in its books and records as "Piers and Waterfront Properties" which consisted of 33 parcels of land, on 22 of which there were buildings or structures. The petitioner continuously used these properties in its trade or business during the taxable years involved and the structures and buildings were property of a character which is subject to exhaustion, wear, and tear.

As of December 31, 1933, the agreed cost or other basis of the land included in the classification "Piers and Waterfront Properties" was $2,571,259.31. Of this amount the cost or other basis of 11 parcels of land on which there were no structures or buildings was $389,500. The aggregate cost or other basis of the buildings or structures on the improved parcels of land on December 31, 1933, was $1,812,230.26. The cost or other basis of the buildings and structures on December 31, 1933, includes that of buildings and structures erected in 1932 at a cost of $127,837.

The property ledger of the petitioner carried separate accounts for each parcel of real estate included in "Piers and Waterfront Properties." Each such account showed separately the cost of the land and the cost of the buildings and structures thereon. Petitioner's general ledger carried a control account entitled "Piers and Waterfront Properties", in which the total basis for land and buildings and

structures was reflected without segregation between parcels or between land and buildings.

The petitioner made monthly credits in its books and records to its depreciation reserve with respect to the particular buildings and structures included in the "Piers and Waterfront Properties." The aggregate of the monthly credits was entered in the respective individual property account at the close of each year. No depreciation was at any time set up on the petitioner's books and records computed on any basis other than that of cost of the buildings and structures. The cost or other basis of land never entered into the computation of depreciation or the depreciation reserve set up on petitioner's books.

As of January 1, 1921, total depreciation had been taken upon the buildings and structures included in the "Piers and Waterfront Properties" in the amount of $455,076.08. In its original income tax returns for the years 1921 to 1933, inclusive, petitioner deducted depreciation with respect to the various properties referred to as "Piers and Waterfront Properties." In these returns the assets were designated "Wood—Steel—Concrete—Piers and Waterfronts." Each return stated the age and probable life of the depreciable properties.

In its income tax returns for the years 1921 to 1925 the petitioner claimed depreciation on its "Piers and Waterfront Properties" in the aggregate total of $385,561.16. On or about December 9, 1926, petitioner filed amended income tax returns and claims for refund for the years 1921 to 1925, inclusive, claiming that the depreciation sustained on its "Piers and Waterfront Properties" during those years was $741,679.55 in lieu of the amount of $385,561.16 claimed on the returns. In making such claim the petitioner included in the basis for the depreciation allowance the cost of land included in the classification of assets "Piers and Waterfront Properties." A revenue agent examined the petitioner's books of account for the purpose of verifying its claim for additional depreciation and, misled by the petitioner's claims and the petitioner's general ledger control account including therein the cost of land, determined that depreciation had been sustained for the five years 1921 to 1925 of $744,411.28, or $2,731.73 more than the petitioner claimed in its amended returns. The petitioner's tax liabilities for the years 1921 to 1925 were adjusted as above indicated and the petitioner received full benefit for the additional allowances for depreciation for those years.

In its income tax returns for the years 1926 and 1927 the petitioner deducted from gross income depreciation claimed to have been sustained on "Piers and Waterfront Properties" in the amounts of $65,136 and $81,180, respectively. Its returns were audited by a revenue agent who examined petitioner's books of account for the purpose of verifying such returns. He determined that the depre-

ciation sustained on "Piers and Waterfront Properties" for 1926 was $148,800.43 and for 1927 $157,775.02. Upon the basis of such examination the respondent determined overassessments and overpayments of income tax for 1926 and 1927, thereby giving the petitioner the benefit of the deduction of depreciation allowances recommended by the revenue agent.

In its original income tax returns for all of the years 1928 to 1933, inclusive, the depreciation allowance on "Piers and Waterfront Properties" was based upon the cost of buildings and structures and not upon land.

The amounts of the depreciation allowance claimed by the petitioner in its income tax returns for 1932 and 1933 were $84,240.98 and $87,324, respectively.

The cost to the petitioner of the buildings and structures included in "Piers and Waterfront Properties" erected prior to 1932 was $1,684,393.26. The depreciation allowances made to the petitioner in its income tax returns for years prior to 1932 on "Piers and Waterfront Properties" was in excess of that amount. In 1932 the petitioner erected buildings and structures on property acquired by it in that year at a cost of $127,837. The depreciation allowances claimed and allowed by the respondent for the years 1932 and 1933 were in excess of that amount.

The question for decision is whether the petitioner has exhausted the depreciation base of its property categorically described on its books of account as "Piers and Waterfront Properties." Respondent contends that excessive depreciation computed upon a basis which through error included cost of land and which was allowed for the years 1921 to 1927, inclusive, has resulted in the exhaustion of the depreciation base for the buildings and structures contained in that group of assets. The petitioner claims that the depreciation in question was actually allowed as depreciation on land, that the excess depreciation was not allowed on buildings and structures, and that therefore the excess allowances can not be used to reduce the basis of the buildings and structures which were in good condition in 1934 and had a useful life of several years beyond that date. In the alternative petitioner argues that depreciation allowed for the years 1921 to 1927 can not be used to reduce the adjusted basis of assets acquired in 1932.

The basis upon which depreciation is allowed is provided for in section 114 (a) of the Revenue Acts of 1934 and 1936, which are identical provisions and read as follows:

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.

The pertinent provisions of section 113 of the Revenue Acts of 1934 and 1936 are as follows:

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; * * *

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made.—

*　　　*　　　*　　　*　　　*　　　*　　　*

(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws. * * *

The petitioner contends that the instant case is controlled by *Pittsburgh Brewing Co.*, 37 B. T. A. 439; reversed on another point, 107 Fed. (2d) 155. In that case the taxpayer sought to deduct depreciation on various classes of assets. The bases of some classes of assets had been exceeded by previous allowances and respondent allocated the excess depreciation taken on these groups against the unexhausted basis of another class. We held that such an allocation was improper inasmuch as the taxpayer had not used a composite rate of depreciation and the statute requires adjustment for depreciation allowed only in respect of the property upon which such depreciation was allowed and without regard to other property or classes of property.

It is our opinion that the *Pittsburgh Brewing Co.* case is distinguishable on its facts from the instant proceedings. There is no question here of allocation of excess depreciation allowed on one asset or class of assets against the unexhausted basis of other assets or another class of assets. The amended returns, claims for refunds, and the revenue agent's reports all show clearly that the respondent allowed the depreciation in question on the class of property described in petitioner's books as "Piers and Waterfront Properties." It is apparent that a grievous error was made both by the petitioner and the respondent in the computation of reasonable allowances for depreciation upon the "Piers and Waterfront Properties" for the years 1921 to 1927. The petitioner included in its base upon which the depreciation was claimed in the amended returns the cost of the land as a depreciable asset. The respondent did not detect the error.

Although the petitioner did not make claims for excessive depreciation for the years 1926 and 1927, the respondent adjusted its returns for those years upon the same basis as it had adjusted the depreciation allowance for the years 1921 to 1925 upon claims made by the petitioner. The error was plainly one committed in the first instance by the petitioner. The petitioner got the benefit of exces-

sive allowances for depreciation for years prior to 1934. It can not now be heard to say that the respondent is chargeable with the error. See *Comar Oil Co.* v. *Helvering* (C. C. A., 8th Cir.), 107 Fed. (2d) 709.

The petitioner contends that an erroneous allowance for depreciation of the years 1921 through 1927 may not be corrected by what it argues would be a second erroneous computation for the taxable years, the effect of which would be to distort net income in the later years. The respondent argues, however, that the statute expressly requires an adjustment of basis in the current year to reflect a previous excessive allowance. The statute referred to is section 113 (b) (1) (B) of the Revenue Acts of 1934 and 1936, *supra*, which requires the adjustment of the basis of property for exhaustion, wear and tear "to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws."

Adjustment of basis for amounts previously allowed was first required by the Revenue Act of 1932. With regard to the inclusion of that provision in the law the Senate Finance Committee reported as follows:

The Treasury has frequently encountered cases where a taxpayer, who has taken and been allowed depreciation deductions at a certain rate consistently over a period of years, later finds it to his advantage to claim that the allowances so made to him were excessive and that the amounts which were in fact "allowable" were much less. By this time the Government may be barred from collecting the additional taxes which would be due for the prior years upon the strength of the taxpayer's present contentions. The Treasury is obliged to rely very largely upon the good faith and judgment of the taxpayer in the determination of the allowances for depreciation, since these are primarily matters of judgment and are governed by facts particularly within the knowledge of the taxpayer, and the Treasury should not be penalized for having approved the taxpayer's deductions. * * * [S. R. 665, 72d Cong., 1st sess.; 1939–1 (Part 2) C. B. 517.]

The instant case falls squarely within the purview of the statute and for that reason adjustment of the basis is required for the taxable years for excess amounts allowed for the years 1921 to 1927, inclusive.

The evidence shows that the cost to December 21, 1933, of the depreciable properties included in "Piers and Waterfront Properties" was $1,812,230.26. The depreciation allowed upon this class of properties to December 31, 1933, was in the amount of $1,912,840.83. Since petitioner has already recovered through depreciation allowances the full cost of the depreciable properties it is not entitled to deduct any depreciation in respect of them for the taxable years before us.

With respect to the petitioner's alternative contention that the excess allowances for depreciation in the years 1921 to 1927 should not be held to offset depreciation sustained upon additions to the petitioner's

properties made in 1932 in the amount of $127,837, it need only be said that the evidence shows that the depreciation allowances on the depreciable properties erected prior to 1932 were up to December 31, 1932, in excess of the cost of those properties. The petitioner was not entitled to deduct depreciation in 1932 and 1933 in respect of those properties which had been fully depreciated prior to 1932. It did deduct and was allowed depreciation for 1932 and 1933 in the aggregate amount of $171,364.48. This was in excess of the cost of the structures erected in 1932, namely, $127,837. Since, therefore, the petitioner has recovered through depreciation allowances for 1932 and 1933 the cost of the structures erected in 1932, it is not entitled to deduct depreciation in respect of them during the taxable years.

*Issue 2.—New Jersey Property Tax Adjustments and Abatement of Interest Accrued Thereon.*

The question for consideration on this issue is the correctness of the respondent's inclusion in petitioner's gross income for 1936 of abatements on real property taxes for the years 1933 and 1934 of $59,580 and $58,123.42, respectively, and of the inclusion of accrued interest on such abatements of taxes charged upon the petitioner's books as interest paid for the years 1933, 1934, and 1935 as follows:

| Accrued in | On property taxes for 1933 | On property taxes for 1934 | Total |
|---|---|---|---|
| 1933 | $609.99 | | $609.99 |
| 1934 | 7,322.99 | $1,640.64 | 8,963.63 |
| 1935 | 4,185.32 | 3,864.76 | 8,050.08 |
| Total | 12,118.30 | 5,505.40 | 17,623.70 |

In its income tax returns for 1933 and 1934 the petitioner deducted as taxes paid the amounts which were later abated of $59,580 for 1933 and $58,123.42 for 1934. It also deducted interest accrued upon the amounts abated as indicated by the above tabulation.

In its income tax return for 1936 the petitioner did not include in taxable income the amounts of the taxes abated for 1933 and 1934, but it did include the accrual of $17,623.70 of interest. Its books of account for 1936 showed a reversal of entries relative to the accruals of interest and, since such abatement served to increase surplus, it included the accrual of interest as income of 1936.

The petitioner keeps its books of account and makes its income tax returns upon the accrual basis. It treated as an accrual of taxes for 1933 and 1934 the levies for those years. It is within the calendar year that the amounts of the levies for the calendar year are determined.

The petitioner protested the assessment of real property taxes for 1933 and 1934 upon the ground that the taxing authorities had over-valued its properties. On July 23, 1935, the New Jersey Board of Tax Appeals sustained in part the petitioner's protest and reduced the assessment. The reductions which inured to the petitioner from such action were $59,580 with respect to property taxes of the year 1933 and $58,123.42 with respect to the property taxes of the year 1934. Pursuant to the action taken by the New Jersey Board of Tax Appeals the collector of taxes for the city of Hoboken, in his record of arrearages of taxes, reduced by appropriate amounts the property tax liability of the petitioner and on August 1, 1935, the petitioner paid to the collector of taxes amounts sufficient to bring its payments on account of its property tax liabilities for the years 1933 and 1934 with respect to the properties in controversy up to the correct amounts determined to be due.

On or about September 17, 1935, the city of Hoboken made application to the Supreme Court of the State of New Jersey for a writ of certiorari to the New Jersey Board of Tax Appeals with respect to the action taken by the board in reducing the petitioner's taxes. On September 20, 1935, a writ of certiorari was issued by the Supreme Court of New Jersey.

On November 12, 1936, the corporation counsel for the city of Hoboken notified petitioner that he had concluded to abandon the certiorari proceeding and requested petitioner's consent to a discontinuance thereof, which the petitioner granted. On November 13, 1936, the Supreme Court of New Jersey entered its ruling discharging the writ of certiorari, thereby closing the case.

In these proceedings the petitioner does not question the right of the respondent to include in its gross income for 1936 the amount of the taxes abated for the years 1933 and 1934 and the amount of the interest which had been accrued upon the petitioner's books of account in respect of the abatements for the years 1933, 1934, and 1935, provided the petitioner obtained the benefit of the deduction of those accruals in prior years and provided that adjustments as to the prior years are barred by operation of the statute of limitations. It admits the soundness of the general proposition that a taxpayer on the accrual basis which has received the benefit of deductions in income tax returns of prior years must account for them in a subsequent year when the liability for which accruals had been set up has been canceled if adjustment in the year in which the deduction was taken is impossible due to the statute of limitations or some other consideration. It is not possible to make any adjustments in the deficiency for 1933 in this case because the running of the statutory period of limitations has closed that year.

In the first place the petitioner contends that if it is taxable upon the abatements in any year it is taxable in the year 1935, in which year the New Jersey Board of Tax Appeals decided the issue presented by the litigation. It says that it recognized the finality of the action taken by the New Jersey Board of Tax Appeals and that this is shown by its immediate payment to the collector of taxes for the city of Hoboken of taxes found to be due by the decision of the state board.

We think, however, that the respondent properly determined 1936 to be the year in which the abatements accrued to the petitioner, and not 1935. The city of Hoboken had the right to petition the Supreme Court of the State of New Jersey for a writ of certiorari to review the adjudication of the taxes by the New Jersey Board of Tax Appeals. It made timely application for such a writ and the writ was granted in 1935. It was not until 1936 that the issue was finally determined and the certiorari proceeding discontinued. During the time that the appeal was pending it remained uncertain whether the petitioner would prevail in its action for the reduction of its taxes. Until the proceeding was finally determined by the Supreme Court of the State of New Jersey, the matter was in litigation. *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88; *H. Liebes & Co.* v. *Commissioner* (C. C. A., 9th Cir.), 90 Fed. (2d) 932; *A. M. Campau Realty Co.*, 35 B. T. A. 687; and *Lepman Brothers Co.*, 45 B. T. A. 793.

In the second place, the petitioner contends that the abatement of $58,123.42 of taxes and $8,963.63 of interest, which were deducted from petitioner's gross income for 1934, but never paid, did not constitute taxable income of 1936 and that the deficiency for 1934 should be adjusted in accordance with the decision of the Board in *E. B. Elliott Co.*, 45 B. T. A. 82, and cases cited therein. This contention of the petitioner is sustained upon the authority of the *Elliott Co.* case, *supra*.

The petitioner contends, however, that it never had the benefit of a deduction of its 1934 taxes. It says that for 1934 the respondent disallowed the deduction of its 1934 taxes and substituted in place therefor the taxes which the petitioner claimed as a deduction in its return for 1935. In support of this contention it calls attention to the deficiency notice, page 2, item (e), Docket No. 103902, relating to the deficiency determined by the respondent for 1934. The adjustment made by the respondent is reflected by the following statement:

(e) The deduction for New Jersey property taxes, in accordance with G. C. M. 15305, (Cumulative Bulletin XIV–2, Page 80), has been adjusted as follows:

Taxes accrued, October 1, 1934, (1935 taxes) _____ $487,642.76
Taxes paid _____ 452,622.92

Additional deduction _____ $35,019.84

It is apparent that what the respondent refers to as "Taxes paid" is obviously a misdescription, since the amount of $452,622.92 is shown in the income tax return of the petitioner for 1934 to be the 1934 New Jersey taxes accrued and deducted on the return, $58,123.42 of which was admittedly never paid.

The argument of the petitioner is that since the respondent substituted for the taxes which it deducted on its return as 1934 taxes the 1935 levy of taxes, the petitioner has never obtained the benefit of the deduction of the 1934 taxes. For in its income tax return for 1933 the petitioner deducted as the accrual of taxes for that year the taxes which the respondent considers the accrual of taxes for 1934, and, since the petitioner's return for 1933 showed a net loss, there has never been any adjustment of the petitioner's tax return for 1933.

Under the income tax law a taxpayer is permitted to make its returns upon the basis of its books of account provided they correctly reflect its net income. The petitioner has always kept its books of account by accruing as taxes of the calendar year the taxes which became due and payable in that year. For instance, the 1934 taxes accrued by the petitioner as 1934 taxes are those which are levied for the support of the city government for 1934. In the very nature of things the petitioner could not know in 1933 the amount of the taxes which would be levied for 1934. The respondent contends that the 1934 taxes accrued in 1933 simply because they were levied upon the assessed value of the property on October 1, 1933, and were assessed as of that date. No lien attached for the taxes until December 1, 1934. See *Commissioner* v. *Coward* (C. C. A., 3d Cir.), 110 Fed. (2d) 725.

We are of the opinion that the taxpayer's method of keeping its books of account and accruing as taxes of the taxable year those which become due and payable in the taxable year correctly reflect the taxpayer's income. See *United States* v. *Anderson*, 269 U. S. 422. Merely because taxes for a calendar year are based upon the assessed value of property for a preceding taxable year is beside the question as to whether a taxpayer's books of account kept in the manner by which the petitioner kept its books of account truly reflects income. Upon the authority of cases above cited and of *Carondelet Building Co.* v. *Fontenot*, 111 Fed. (2d) 267, and *New Orleans Cold Storage & Warehouse Co., Ltd.*, 40 B. T. A. 121, we hold that the petitioner correctly accrued as the taxes of 1934 the taxes levied by the city of Hoboken for the support of the city government for that year. That is the year in which they became due and payable, the year in which the amount of the tax was determined and assessed. We are therefore of the opinion that there is no merit in the petitioner's contention that it has not obtained the benefit of the deduction in its 1934 return of the taxes accrued in 1934. As a matter of fact, the accrual allowed

by the respondent in the determination of the deficiency is in excess of the amount that accrued. But the question as to the correctness of the amount of the accrual is not before us.

The petitioner had a net loss for the year 1933 of $27,364.90. The petitioner contends that the only part of the abatement of tax for 1933 ($59,580) and of interest ($609.99) which is income is the excess of the sum of these two amounts over $27,364.90. It contends that since it obtained no tax benefit in the deduction of the accruals of taxes and interest for 1933 in the amount of $27,364.90, it is taxable only upon the excess. This contention of the petitioner must be sustained upon the authority of *Central Loan & Investment Co.*, 39 B. T. A. 981; *National Bank of Commerce of Seattle*, 40 B. T. A. 72; affirmed on another issue, 115 Fed. (2d) 875; *Walter M. Marston*, 41 B. T. A. 847; *Amsco-Wire Products Corporation*, 44 B. T. A. 717; *Hurd Millwork Corporation*, 44 B. T. A. 786; and *State-Planters Bank & Trust Co.*, 45 B. T. A. 630.

For the same reason the accrual of interest for 1935 in the amount of $8,050.08 may not be included in the taxable income of the petitioner for 1936; for the petitioner had a net loss for 1935 of approximately $139,000 and, hence, received no tax benefit from the deduction of the accrued interest in 1935.

### *Issue 3.—Loss on Stock of First National Bank of Hoboken, New Jersey—1934.*

In its income tax return for 1934 the petitioner reported a capital loss of $243,302.72 which it claims was the difference between the cost of its 122,013 shares of stock of the First National Bank of Hoboken, New Jersey, hereinafter called the Hoboken bank, and $488,052 which it claims to have received on the liquidation of the bank in 1934. It reported capital gains for the year of $89,584.97 and other capital losses of $692.38. It contends that the capital loss resulting from the liquidation of the Hoboken bank is available to offset its capital gains and, in addition, that it is entitled to the deduction of a capital loss of $2,000. In the determination of the deficiency the respondent has disallowed any capital loss in respect of the alleged liquidation of the Hoboken bank.

On November 30, 1934, the petitioner owned 122,013 shares of the capital stock of the Hoboken bank, which, it is stipulated "had a cost or other basis to petitioner at November 30, 1934, of not less than $731,554.72, any greater basis depending upon the final determination or disposition of the issue arising out of the payment of $325,000 by petitioner to the Hoboken bank referred to" below. As the result of negotiations culminating in November 1934, the First National Bank of Jersey City, New Jersey, hereinafter referred to as the Jersey

City bank, agreed to take over the Hoboken bank and assume all of its liabilities, other than stock liabilities, and to pay therefor $625,000, which it was agreed the stockholders of the Hoboken bank should immediately reinvest in the purchase of additional shares of stock of the Jersey City bank. A liquidating agent was appointed for the Hoboken bank. In order to comply with the provisions of national banking laws the transaction took the character of a purchase by the Jersey City bank of all of the assets of the Hoboken bank for the amount of $625,000, which by prior commitment the stockholders of the Hoboken bank were required to invest in the acquisition of additional shares of capital stock of the Jersey City bank to be issued. The $625,000 in question was at all times retained by the Jersey City bank although a check was drawn by the Jersey City bank for $625,0000 in favor of the Hoboken bank and the Hoboken bank simultaneously drew a check for a like amount in payment for the additional shares of stock of the Jersey City bank. Under this arrangement the petitioner received for its 122,013 shares of stock of the Hoboken bank 4,880.52 shares of stock of the Jersey City bank. The petitioner claims that there was a liquidation of the Hoboken bank, as a result of which it received $488,052 in exchange for its 122,013 shares of stock which admittedly had cost it at least $731,-554.72. It contends that the Hoboken bank received $625,000 for all of its assets which amount was received by its agent, who then purchased for Hoboken bank stockholders the new stock issued by the Jersey City bank. The respondent has determined that in reality there was only one transaction and that that amounted to a reorganization of the Hoboken bank within the meaning of the Revenue Act of 1934, as amended by the Revenue Act of 1939, and that the Jersey City bank acquired the assets of the Hoboken bank solely in exchange for its voting stock; and that the petitioner received the Jersey City bank stock in exchange for its shares of stock in the Hoboken bank pursuant to the plan of reorganization. If the petitioner's version of the facts is correct, it is entitled to a deduction for the realized capital loss; if the respondent's contention is correct no deduction is allowable.

The pertinent provisions of the Revenue Act of 1934 are as follows:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

Section 112 (g) (1) (as amended by section 213 (g) (1) and (2) of the Revenue Act of 1939) reads as follows:

(g) DEFINITION OF REORGANIZATION UNDER PRIOR ACTS.—

(1) Section 112 (g) (1) of the Revenue Acts of 1938, 1936, and 1934 are amended to read as follows:

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; or the acquisition by one corporation in exchange solely for all or a part of its voting stock of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected."

(2) The amendments made by paragraph (1) to the respective Acts amended shall be effective as to each of such Acts as of the date of enactment of such Act.

Uncontrovertible evidence shows that the Jersey City bank desired to acquire the business of the Hoboken bank in connection with the increase in its capital stock. Under Federal law, however, any such increase in the capital stock of a national bank is required to be paid for in cash and the bank was so instructed by the Comptroller of the Currency. For reasons of their own the two banks had found it not feasible to follow Title 12, U. S. C., sec. 33 (48 Stat. 162) which provides the method for merger of two or more national banks. The petitioner urges that these requirements of Federal law prove that there were two separate transactions in the instant case. The answer to this contention is that we are not concerned with the application of the banking law. Furthermore, a "detour" of any real or feared impediments in such law will not of itself prevent us from finding that a reorganization within the purview of the tax law has been effected. *Elmer W. Hartzel*, 40 B. T. A. 492. The question is whether in substance there was a plan of reorganization. *Gunby, Inc.* v. *Commissioner* (App. D. C.), 122 Fed. (2d) 203. A formal and express plan is not required by the statute when the facts and circumstances show that there was a real plan and that it was carried out. *William H. Redfield*, 34 B. T. A. 967.

The agreement of November 27, 1934, provided for payment for the assets of the Hoboken bank by the Jersey City bank in the following manner:

By the assumption of the liabilities * * * and by making available through a credit to be made on the books of the Second Party [Jersey City bank] to First Party [Hoboken bank] in liquidation the sum of $625,000 *to be expended for the purpose of an increase* in the capital stock of Second Party in favor of the stockholders of First Party * * *. [Emphasis supplied.]

The agreement further provided:

* * * *it being* understood and *agreed* by and between both parties hereto, *that the sum of $625,000* realized by the First Party and made available to stockholders of First Party through the purchase of its assets and the assumption of its certain liabilities under this agreement, would be under appropriate subscriptions and agreements, *used and expended by the stockholders of First Party for the purchase and payment of said increase in the capital of Second Party* * * *. [Emphasis supplied.]

The petitioner contends that the language of this agreement provided for the payment of cash to the Hoboken bank to be distributed to its stockholders and that the latter might of their own free will keep the money or use it in payment for Jersey City bank stock. Manifestly no such construction can be placed upon the agreement. The agreement clearly restricts the use of the cash to be "paid" by the Jersey City bank to a purchase of Jersey City bank stock. The $625,000 "payment", upon which the petitioner relies so heavily, was to remain the complete property of the Jersey City bank until it was entirely certain that the money would be immediately repaid to it. In substance the whole plan was that the Jersey City bank would acquire the assets of the Hoboken bank solely in exchange for a part of its voting stock.

Before the plan was carried out it was necessary, under the terms of the agreement, to obtain the subscriptions of Hoboken bank shareholders to the Jersey City bank's new stock. This was done, but a few shareholders failed to subscribe. That these nonassenting shareholders ultimately received cash is urged by petitioner to preclude the designation of the transaction as a reorganization. The point might be well taken if the Jersey City bank had furnished the cash for these payments since in that event the consideration furnished by it would not be "solely" voting stock and the assumption of liabilities. Cf. *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194 The plan provided, however, that every cent of the $625,000 purported to be "paid" by the Jersey City bank would be returned to it in payment for its increased capital stock. In the face of this fact the petitioner's stated intention that the money paid in by it to subscribe to the stock not taken by the nonassenting stockholders was to go directly to the Jersey City bank fails to prove that they were paid out of the fund furnished by that bank. It does not indicate what the mutual agent actually did. The Jersey City bank actually furnished no cash consideration for the transfer, but "solely" voting stock.

The events of December 28 and 29, 1934, followed the plan in full. The Jersey City bank gave to the agent for the Hoboken bank its check in the amount of $625,000. The agent gave to the Jersey City bank his check, as agent for the Hoboken bank and its stockholders, in the amount of $625,000. Both checks were paid, and the Jersey City bank thereupon delivered the new stock to the agent for distribution. The situation is strikingly similar to that found in the cases of *Gunby, Inc.* v. *Commissioner, supra,* and *Thurber* v. *Commissioner* (C. C. A., 1st Cir.), 84 Fed. (2d) 815. In the *Gunby* case the taxpayer had subscribed to all the stock of a corporation and the corporation had agreed to purchase certain securities owned by him. Accordingly the taxpayer gave the corporation his check to pay for the stock subscribed for and the corporation gave him its check in substantially the same amount as the purchase price for the securities. The two checks were deposited simultaneously so as to cancel each other. The form of the transaction was not adopted because of a desire to avoid or evade taxes. The court held that the transaction constituted, in substance, an exchange of property solely for stock in the corporation and therefore was a reorganization within the meaning of the statute, and not two sales as contended by the Commissioner. The exchange of checks was no more than a "wash" transaction, since one offset the other. In the *Thurber* case, one national bank, pursuant to a plan, gave agents for the stockholders of a savings bank its check in payment for the shares of stock of the savings bank, which check was immediately endorsed back to the national bank by the recipients in return for certain of its shares of stock. Thereafter all the assets of the savings bank were transferred to the national bank and the latter assumed the liabilities of the former. The agents distributed the stock of the national bank to the shareholders of the savings bank. The Commissioner determined that the transaction amounted to a sale of the assets of the savings bank, and the taxpayer contended that it was a tax-free reorganization of that bank, and that no gain arose thereon. The court sustained the taxpayer's contention on the ground that the substance of the transaction, when viewed as a whole, should control its tax consequences.

The petitioner urges that the instant case is to be distinguished from those discussed above upon the ground that here the checks were actually paid by the drawee banks, whereas in the *Gunby* case neither the corporation nor the taxpayer had sufficient balances to pay them, and the checks were permitted to cancel each other, and in the *Thurber* case the check was merely reendorsed to the maker. We regard these distinctions to be without controlling weight. In the instant case, as in the *Thurber* case, the recipients of the check from the bank were absolutely bound either to hand it back imme-

diately in payment for the stock or to use the proceeds thereof to pay for the stock. We would be disregarding reality entirely to hold that in this case there was a bona fide purchase of the assets of the Hoboken bank by the Jersey City bank for cash. See also, *Howard* v. *Commissioner* (C. C. A., 6th Cir.), 56 Fed. (2d) 781.

Upon all the evidence we hold that petitioner, pursuant to a plan of reorganization, exchanged stock in a corporation a party to the reorganization, solely for stock of another corporation a party to the reorganization, within the meaning of the Revenue Act of 1934. Accordingly, the respondent's determination that no loss is to be recognized upon the exchange is approved.

### *Issue 4.—Loss on Assets Acquired From the Hoboken Bank.*

In its income tax returns for 1934, 1936, and 1937, the petitioner deducted from gross income as bad debts the amounts of $41,432.71, $9,633.43, and $41,349.44, respectively, on account of its pro rata share of alleged bad debts arising from the liquidation or other disposition of assets referred to below. In its petition relating to year 1934, Docket No. 103902, the petitioner alleges:

The respondent erred in not allowing as a deduction for the calendar year 1934 a loss of $88,334.89 sustained by the petitioner upon the liquidation of certain assets purchased jointly by the petitioner and others during the year 1933 from The First National Bank of Hoboken.

The petition states:

(5) The facts upon which the petitioner relies as the basis of this proceeding are as follows:

*     *     *     *     *     *     *

(c) On January 10, 1933, the petitioner, together with certain other stockholders of The First National Bank of Hoboken, purchased from said bank certain of that bank's assets for a cash consideration of $325,000.00. Of the total purchase price of $325,000.00 paid for the said assets, the petitioner paid $296,999.13 and other stockholders paid $28,000.87; and by such payment the petitioner acquired an interest of 119,942/131,250 in said assets.

(d) During the calendar year 1934, certain of the assets acquired from The First National Bank of Hoboken as set forth in paragraph (c) above, were sold at a loss of $60,663.00, and certain notes receivable included in the said assets, for which the sum of $36,000.00 was paid, were determined to be worthless. The petitioner's portion of the total loss of $96,663.00 thus sustained amounted to $88,334.89, or 119,942/131,250 of $96,663.00. The respondent has refused to allow any deduction for said loss.

In its petition relating to deficiencies determined by the respondent for the years 1936 and 1937, Docket No. 103779, the petitioner simply alleges that the respondent erred in the disallowance of bad debts in the amount of $9,633.43 for 1936 and $41,349.44 for 1937, "claiming that no loss deductible under Section 23 (k) of the Revenue Act of 1936 was sustained * * * through liquidation of the trust estab-

lished on or about December 1, 1932, for the benefit of stockholders of the First National Bank of Hoboken."

The facts giving rise to these claims on the part of the petitioner are, briefly, that in November 1932 the Hoboken bank was in a serious financial condition. On or about November 4, the chief national bank examiner for the Federal district in which the city of Hoboken is located directed the bank "to remove or dispose of certain doubtful assets and provide additional capital for the bank in order to improve its financial condition." He required that the bank provide at least $850,000 additional capital in order to continue in business.

The Hoboken bank had an outstanding capital stock of $625,000 which consisted of 25,000 shares with a par value of $25 each. The petitioner owned 2,881 of these shares, which had cost it a total of $257,032.44. The bank's officers took the matter up with officers of the petitioner, stating that the bank would have to be placed in the hands of a receiver unless the additional capital required by the bank examiner were forthcoming.

The petitioner had a great deal at stake in the business affairs of the city of Hoboken. It was receiving rentals in excess of $1,000,000 per year and it was appreciated that if the Hoboken bank, the largest one in the city, went into the hands of a receiver, two other banks, and, possibly others, would likewise be placed in the hands of receivers and the petitioner would be required to pay a 100 percent assessment upon its stock, which would amount to $72,025.

A special meeting of the petitioner's board of directors was held on November 23, 1932, to consider the appeal of the officers of the Hoboken bank for assistance. At this meeting one of the bank's officers presented the full situation of the bank. It was stated that the bank examiner's report showed some $500,000 which must be charged off at once, a part of which amount represented loss on defaulted bonds. Also, there was a bond depreciation of $1,088,000, of which $713,000 represented depreciation on bonds which in the opinion of the bank examiner should be disposed of as soon as possible as some of the issuing companies appeared to be headed toward receivership. It was further stated that the bank needed $850,000 new capital. The bank official advised the petitioner's directors of a proposed plan which met with the approval of the national bank examiner. Under this plan:

* * * the burden of all of the losses would be thrown upon the present stockholders by reducing the par value of the capital stock to $200,000.00 or less and simultaneously reinstating the par value of the stock to its present status [$625,000] and the subscribing by the Land Company [petitioner] to the new stock at a cost of $850,000.00; that this plan had been worked out with the Chief National Bank Examiner and was apparently the only means of saving the Bank from closing its doors. * * *

At a later special meeting of the board of directors held December 1, 1932, the petitioner resolved to come to the assistance of the Hoboken bank and be responsible for the raising of the $850,000 required by the national bank examiner. The plan which was ultimately worked out was that the par value of the then outstanding shares should be reduced from $25 to $4, thus bringing the capital stock down to $100,000, and that there then should be issued 131,250 shares of additional stock of a par value of $4, which would bring in $525,000 additional capital. The petitioner then proposed to the bank that the subscribers to the additional shares of stock should acquire for a consideration of $325,000 a like amount of the bank's assets which the national bank examiner required the bank either to charge off or otherwise dispose of. It was appreciated that some stockholders of the Hoboken bank besides the petitioner would either desire or be willing to acquire additional shares of stock of the Hoboken bank upon the same terms that the petitioner was acquiring additional shares. Such stockholders were given an opportunity to subscribe for additional shares of stock and acquire an interest in the $325,000 fund. It was determined that the cost to each subscriber of one additional share of stock should be $6.4762. Each such subscriber would receive one share of stock for each $6.4762 paid and, in addition, a participation certificate in the $325,000 fund.

A letter was addressed to the Hoboken bank by the petitioner on January 9, 1933, reading as follows:

I am enclosing herewith a note dated January 10, 1933, for $325,000, payable January 10, 1934, without interest. This note is to cover the purchase of $325,000 of charged off assets of the bank, as per our proposal of December 1, 1932, and contained in copy of resolution of our Board of Directors of that date.

It is understood that the list of charge-offs will be mutually agreed upon and will be set up for our account. The bank will continue to collect whatever possible of these written off assets, crediting the proceeds on this note.

It is also understood that the scheme of reorganization of the bank will be effected on January 10, 1933, will include purchase of new shares of stock by the present stockholders of the bank, and for this amount the bank will charge $6.4762 per share, of which amount $4.00 will represent the paid in par value of each share of new stock issued to the stockholder and the remaining $2.4762 per share will represent the purchaser's share in the above mentioned $325,000 fund of charged off assets purchased by the Hoboken Land and Improvement Company. The amount of $2.4762 per share for each new share of stock purchased will be credited to the $325,000 note above referred to, and it is agreed and understood that at the end of the year the owner of each of such shares of stock shall be paid in cash, out of the $325,000 account, the aliquot part of the salvage obtained from the written off assets during the year.

I am sending you this letter in duplicate. Will you kindly acknowledge your acceptance on the duplicate and return to this office?

This proposition was accepted by the Hoboken bank on January 10, 1933.

Under the plan each payment of $6.4762 included $4 in payment for a share of stock and $2.4762 for a 1/131,250 of the $325,000 fund. The petitioner paid $479,768 upon its subscription for 119,942 shares and $296,999.13 for its interest in the fund and other stockholders paid $45,232 for 11,308 shares and $28,000.87 for their interest in the $325,000 fund.

The Hoboken bank agreed to act as trustee of the $325,000 fund; to use its best efforts to collect outstanding accounts set aside to the fund; and to sell for the best interests of the participants other assets set aside to the fund. The assets set aside included the notes of individuals and corporations, certain real estate, and certain bonds of doubtful value. The Hoboken bank was not to be held liable to the participants for any part of the assets so set aside. It provided that it should:

\* \* \* not be called upon or be obliged to disburse any monies coming into its hands from said assets until such time as said Trustee shall in its discretion deem that a sufficient amount has been received as to make such distribution practical.

It was also provided that the trustee should reimburse itself from any assets in the fund for necessary expenses incurred in the collection of accounts or in the sale of other assets. The Hoboken bank had prior claims upon many of the accounts receivable and upon the assets of the fund and in every instance the Hoboken bank was to be paid in full before the participants in the fund received any portion of the proceeds.

Up to the close of 1937 the trustee had collected for the participants in the fund $42,472.23 principal and $4,010.91 interest, or a total of $46,483.14. In 1934 the trustee sold bonds which had been set aside to the participants at a cost of $61,407 at a loss of $60,663. The trustee also determined in 1934 that certain debts set aside to the fund were worthless in the amount of $35,000. It is stipulated, however, that there was no charge-off on the trustee's books of account of these debts in 1934 although "said notes were continuously thereafter [after 1934] treated as worthless obligations in the records of said Trust Department."

On December 28, 1934, the Jersey City bank succeeded to the right, title, and interest of the Hoboken bank in the properties which had been set aside for the participants in the trust fund. Thereafter the trust department of the Jersey City bank continued efforts to collect or to liquidate the properties not previously disposed of by the Hoboken bank.

In 1936 the trustee for the participants determined that $7,625.28 of the accounts receivable set aside to the trust were worthless and notified the petitioner of its determination.

During 1936 the trust department of the Jersey City bank charged against and deducted from petitioner's participation in the realiza-

tions or collections effected in that year on account of the assets held by the trust the sum of $2,665.13 representing petitioner's pro rata share of legal expenses incurred in the effort to liquidate those assets.

During 1937 the petitioner disposed of certain real estate which had been set aside to the fund. The trust fund's interest in the real estate amounted to $9,585.25. This was a total loss in the year 1937. In 1937 also the trustee ascertained that accounts receivable by the trust in the amount of $35,662.58 were worthless and charged those amounts off as such.

The petitioner claims that it is entitled to deduct from its gross income for each of the years in question the amount deducted in its return for each year either as a loss or as a bad debt. It further contends that it is entitled to deduct from the gross income of 1936 as an ordinary and necessary expense the amount of $2,665.13 which was charged against its interest in the fund for legal expenses in attempts to collect accounts. It contends that the participants in the $325,000 fund were the owners of those assets; that they had purchased them at a price of $325,000; that there was no trust set up as a taxable entity, and that the Hoboken bank, and later the Jersey City bank, merely acted as its agent in the management of the fund. Under this theory the participants in the fund would be taxable upon the interest collected by its agent; would be entitled to deduct the amounts paid as legal expenses in 1936, of which amount the participants' share was $2,665.13, and likewise would be entitled to deduct losses sustained upon the disposition of the assets and bad debts in the amount set forth above.

It is respondent's contention, however, that the entire amount of $850,000 paid in by the petitioner and other stockholders for the 131,250 additional shares of stock of Hoboken bank and a like number of participation certificates represented the cost of the 131,250 shares and that the new stockholders did not make a bona fide purchase of the doubtful assets of the Hoboken bank at a price of $325,000. The respondent submits that the petitioner and the other stockholders would not have purchased these doubtful assets at face value except in connection with the purchase of the shares of stock. He further submits that the investment by the petitioner of $296,999.13 for its interest in the $325,000 fund was merely a contribution to the Hoboken bank or an additional investment in its shares made to protect petitioner's original investment in the bank stock.

The petitioner's board of directors during the discussion of the recapitalization of the Hoboken bank stated in express language that they expected the new stock would cost the petitioner $6.47 per share.

We think that the respondent's contention is sound. Quite clearly the petitioner would not have acquired an interest in the doubtful assets of the bank except in connection with the purchasing of additional shares of stock. It must have been clear to the petitioner's

board of directors that many of the assets were worthless or nearly worthless.

In *C. H. C. Jagels*, 23 B. T. A. 1041, the stockholder believed the assets which the taxpayer purchased from a bank would be paid in full ultimately. Three years later he sought to deduct his contribution on three grounds: (1) as a business loss; (2) loss on transaction for profit; (3) as a bad debt. The Board denied the deductibility. On appeal the United States Circuit Court of Appeals for the Third Circuit (*Jagels* v. *Commissioner*, 72 Fed. (2d) 925) stated:

\* \* \* the Board found that there was no testimony to show that his purpose in entering into the transaction was to derive a profit, but that, on the contrary, his manifest purpose was to safeguard the investors in the bank of which he was president and a director, and to maintain the credit of the bank.

The same reasoning prevails in *Snider B. Ward*, 18 B. T. A. 326; *J. S. Maubaules*, 20 B. T. A. 359; and *Edgar M. Carnrick*, 21 B .T. A. 12.

In *American Cigar Co.* v. *Commissioner* (C. C. A., 2d Cir.), 66 Fed. (2d) 425, the court said at page 427:

\* \* \* Such advances, made with the belief they would not be repaid, are in the nature of gifts, and are not deductible as bad debts. *Hayes* v. *Commissioner of Internal Revenue*, 17 B. T. A. 86. See *Shiman* v. *Commissioner of Internal Revenue* (C. C. A.) 60 F. (2d) 65, at page 66. The advances were in reality contributions to the capital of the Havana Company, in which the petitioner was a stockholder. Contributions to capital cannot be deducted as debts ascertained to be worthless. \* \* \*

The Board has frequently held that the payment to protect an investment does not constitute a deductible loss. *J. S. Maubaules, supra; Charles F. Ayer*, 7 B. T. A. 324; affd. (App. D. C.), 26 Fed. (2d) 547; *T. B. Floyd*, 11 B. T. A. 903.

We are of the opinion that the respondent did not err in his disallowance of the amounts deducted on the petitioner's returns as bad debts. We think the correct view is that any amounts which may ultimately be recovered by the participants in the $325,000 fund should be charged against and operate to reduce the cost basis of the investment of the participants in the additional shares of stock acquired by each. It does not appear from the record whether the participants have ever received from the trustee any distribution upon their participation certificates.

We are also of the opinion that the petitioner is not entitled to deduct as an ordinary and necessary expense the $2,665.13 paid by the Jersey City bank for legal expenses in attempting to collect some of the worthless accounts. The amount was charged by the trustee against collections which had been made by it for the participants. It operated merely to reduce the amount of the fund held by the trustee for the participants.

*Decisions will be entered under Rule 50.*