W. N. FRY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 758.   Promulgated November 14, 1945.

*W. G. Boone, Esq.,* for the petitioner.
*Bernard D. Hathcock, Esq.,* for the respondent.

1060

1062

1064

OPINION.

Tyson, *Judge*: Respondent contends as to the first issue (a) that the distribution to petitioner by the old bank in 1939 of shares of stock in the new bank constituted a distribution in partial liquidation of the old bank under section 115 (i) of the Internal Revenue Code,[1] and that consequently there was a gain of $1,035 realized by petitioner therefrom, which gain is taxable as a short term capital gain in accordance with the provisions of section 115 (c) of the Internal Revenue Code. More specifically, the respondent contends that the distribution was one "in partial liquidation" under the second of the two forms of partial liquidation defined by section 115 (i), *supra*, viz: "one of a series of distributions in complete cancellation or redemption of all or a portion of its stock," and in support of this contention points out various expressions shown in the minutes to the effect that the old bank was to be liquidated.

Petitioner contends as to the first issue that he received the shares of stock in the new bank in exchange for his stock in the old bank made pursuant to a plan of reorganization and that consequently no gain or loss is to be recognized under section 112 (b), (g), and (h) of the Internal Revenue Code [2] as operative during the taxable year.

---

[1] (i) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation to complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

* * * * * * *

(g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b) (10) and subsection (l) and in section 113 (other than subsection (a) (22))—

(1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) a transfer by a corporation of all or a

In the alternative, petitioner contends that "If the 1939 transaction was not an exchange, then it was a distribution in pursuance of a plan of reorganization and the gain, if any, is a capital gain subject to the limitations of Sec. 117" of the Internal Revenue Code.

Respondent urges the following circumstances in support of his determination and contention that petitioner received the new bank stock as a distribution in partial liquidation under section 115 (i), *supra:*

(1) That the distribution of the 4,910 shares of capital stock of the National Bank of Commerce in Memphis was "in partial liquidation" of the Bank of Commerce & Trust Company as characterized in the very resolution which provided for the distribution, and (2) that the reduction in par value of the capital stock of the Bank of Commerce & Trust Company was, as clearly evidenced by the corporate minutes, made for the definite purpose of reducing the amount of outstanding capital stock in order to give effect to the partial liquidation of that bank.

However, the answer to the question of whether or not the distribution was one "in partial liquidation" is not determinative of the tax consequences of the distribution here involved if such distribution was pursuant to a plan of reorganization and there was a reorganization in fact thereunder. Sec. 115 (c), I. R. C.[3] No gain or loss is recognized on such distribution. *Fisher* v. *Commissioner*, 108 Fed. (2d) 707; *Peck & Peck*, 42 B. T. A. 651; *Anna V. Gilmore*, 44 B. T. A. 881; affd., 130 Fed. (2d) 791; *Hortense A. Menefee*, 46 B. T. A. 865; *Morley Cypress Trust, Schedule "B"*, 3 T. C. 84; *Richard H. Survaunt*, 5 T. C. 665.

All parts of the transaction are to be considered together rather than separately, *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179, and if there was, in fact, a "reorganization" of the old bank, its liquidation is merely one step in an integrated transaction.

The first question arising in natural sequence is whether or not there was a reorganization embracing the old and new banks as parties

part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (E) a recapitalization, or (F) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

(h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. \* \* \*

thereto under section 112 (g) (1) (D), *supra*. The only contentions of respondent as to this question are: First, that the evidence fails to establish in whom title to the stock of the new bank was vested on its issuance and consequently fails to show the requisite control; and, second, that the evidence fails to show that any assets were transferred by the old bank to the new.

As to the first contention respecting title to the stock of the new bank, we have found as a fact that the old bank subscribed to all of the new bank stock, except directors' qualifying shares, and that such stock was pledged to RFC by the old bank as security for the $2,000,000 borrowed therefrom by the old bank to finance the stock subscription. The stock when released from pledge to RFC was returned to the old bank and distributed by it to its shareholders. Furthermore, respondent's answer admits that "with the exception of qualifying shares of directors, all of the capital stock of the new bank was subscribed and paid for by the old bank which was in control of the new bank immediately after the transfer of assets to the new bank." In the face of such a record, any suggestion that the old bank did not take title to the stock of the new bank at the time of its issuance is untenable.

The second contention as to the transfer of assets from the old to the new bank is also untenable in view of the facts: That the answer of respondent explicitly admits that the old bank was "in control of the new bank immediately after the transfer of assets to the new bank"; that the evidence shows that $2,000,000 in cash which had been received by the old bank as a loan from RFC, thereupon becoming an asset of the old bank, was also transferred to the new bank in payment for its stock; and the uncontradicted testimony of Canale that the old bank transferred substantially all its liquid assets to the new bank. Taking these established facts together with the further established fact that "immediately after the transfer" of such assets, the old bank, through its ownership of all the stock of the new bank, except directors' qualifying shares, was in "control" of the latter bank as the word "control" is defined in section 112 (h), *supra*, it is clear that there was a reorganization within the provisions of section 112 (g) (1) (D), *supra*.

Having concluded that there was a reorganization, further questions arise as to whether or not the other requirements of section 112 (b) (3) have been met. Respondent contends that they have not in that: First, there was no "exchange" of stock for stock in compliance with the requirement of that section as pertinent here because the stockholders of the old bank did not "surrender" their stock in the old bank when they received stock in the new bank; and, second, assuming there was a "plan of reorganization," petitioner failed to prove that the plan extended so far as to provide for the distribution of the stock of the new bank to the stockholders of the old.

With regard to the first contention, that there was no exchange of stock because the stockholders of the old bank did not surrender their old stock upon receipt of the new bank stock, it is to be noted that section 112 (b) (3), *supra*, contains no requirement that the stock be "surrendered." The critical consideration is whether or not there was an "exchange" of stock for stock. In carrying out the plan for distribution of the stocks in the new bank to the stockholders of the old, which we hereinafter find was done, the capital liability of the bank to its shareholders had been cut in half, and the par value of the shares reduced from $100 to $50. The authorization and acceptance of this cut by the shareholders in consideration for the shares of the new bank distributed to them was, under the circumstances, in our opinion, the equivalent of an exchange of stock for stock. To that extent they had exchanged their interests as shareholders of the old bank for stock of the new bank. The status of the shareholders as between themselves and as against the corporation was identical under the method followed, with what it would have been if half of the shares of stock had been surrendered and canceled. We do not believe the mere mechanics of procedure should blind us to the realities. Cf. *Walter S. Heller*, 2 T. C. 371; affd., 147 Fed. (2d) 376; certiorari denied, 325 U. S. 868. Moreover, since it is apparent that the distribution to petitioner was in partial liquidation of the old bank, although but one step in pursuance of the plan of reorganization, we think that this first contention of respondent is disposed of by that provision of section 115 (c), *supra*, relating to partial distribution, which states the "amounts distributed in partial liquidation of a corporation shall be treated as in part or in full payment in exchange for the stock." This first contention of respondent can not be sustained.

With regard to the second contention of respondent, that assuming there was a "plan of reorganization" the petitioner failed to prove that the plan extended so far as to provide for the distribution of the stock of the new bank to the stockholders of the old, we think it also can not be sustained. In his statement to the stockholders at their meeting of April 28, 1933, Canale, a director and member of a committee engaged since January 1933 in devising and formulating a plan, said, *inter alia*, that the committee "devised one or more plans whereby we hoped, * * * to take care of the stockholders of this bank and see, if out of an orderly liquidation of the assets of the old bank, and the formation of a new bank to take over the deposits * * * we could not save the stockholders *their* investment in the Bank of Commerce & Trust Company"; that "we finally consummated this plan which we now submit to you"; "That means that you stockholders are the *ultimate owners* of the capital stock of the new bank"; that by reason of the stock ownership by the old bank of all

the capital stock of the new bank "there is, practically speaking, an identity of interests between the old bank and the new bank"; that "the assets of this bank must be liquidated in a proper and orderly way, * * * in order to net the most from the liquidation of the old bank so that its debts can be paid and the *equity* in its assets [including the equity in the old bank's stock in the new bank] turned over to you, as stockholders of the Bank of Commerce & Trust Company"; and that "When the rest of the assets are liquidated and the creditors are paid off, what remains [including the old bank's stock in the new bank if it remained] will be distributed to the stockholders." [Italics and brackets supplied.] After these statements were made by Canale to the stockholders at their meeting, the stockholders at that meeting passed a resolution approving "the proposed plan, as discussed and outlined at this meeting," and authorized the directors to "fully consummate the same" and to "authorize the officers of the bank * * * to do and perform any and all things incident or necessary to the full and proper consummation of the plan outlined and discussed at this meeting."

Canale had also, in presenting the plan to the board of directors of the old bank on the day preceding the meeting of the stockholders above mentioned, stated, *inter alia*, "that the ultimate ownership of the old bank and of the new bank was practically the same, except as to the qualifying shares of the directors of the new bank, which were negligible."

We think it is apparent from what appears on the minutes of the meeting of the stockholders and the meeting of the board of directors of the old bank, as above recited, and there is nothing in material contradiction thereof, that distributions of the stock of the new bank made to the stockholders of the old bank in 1939, including that made to petitioner, were made as a part of and pursuant to a plan of reorganization and in compliance therewith. In this connection it may be observed that there is no requirement that every detail of the plan, or even the plan itself, be reduced to writing. *Hoboken Land & Improvement Co.*, 46 B.T.A. 495, 508; affd., 138 Fed. (2d) 104.

Our conclusion is fortified by the testimony of Phil M. Canale and A. L. Pritchard, the latter being a director in the old bank and chairman of the executive committee which continuously managed that bank from the time of its difficulties in 1933 until the hearing in this proceeding. Canale testified that the ultimate purpose of the reorganization and the "very keystone and foundation of the whole picture was that the equity in the assets in whatever form were to be preserved ultimately for the shareholders of the old bank. That is what we were trying to accomplish"; that the distribution of stock in the new bank in 1939 was a partial consummation of the plan adopted in 1933; and that a proposed plan that the pledgers and

guarantors of the debt of the old bank to RFC be permitted to subscribe for stock in the new bank was objected to and abandoned because to adopt such a plan would defeat the purpose of preserving the good will and equity for the stockholders of the old bank. Pritchard testified that he knew of the various plans that were being proposed and the one finally adopted. He testified further that at the time the new bank was being organized it was his hope and intention that the stock of the new bank should be distributed to the stockholders of the old bank in exchange for their stock in the old bank and that this was "our hope throughout the entire reorganization"; that the distribution made in 1939 was made by the old bank under his direction in pursuance of the plan adopted in 1933, which, as he understood it, was for all of the stockholders of the old bank to become stockholders of the new bank to the extent of the shares they had in the old bank; and that in the "work out" of the plan, the stockholders of the old bank would be the stockholders of the new.

Substantial delay in the stock distribution was inevitable in the "work out" of the plan. The stock was to stand pledged to RFC until the borrowed funds with which it was acquired were repaid or other arrangements made for its partial or total release. When such partial release was obtained, pro rata distribution according to the plan was made immediately. Mere delay in such distribution, where due to reasonable cause, is immaterial, once the existence of the plan is established. *D. W. Douglas*, 37 B. T. A. 1122; *Hortense A. Menefee*, *supra*, and authorities cited therein. As was said in the *Douglas* case, where there was a delay of five years in the distribution:

* * * The original plan was not changed. The execution of a part of it was merely postponed until it could be carried out in full. In the meantime the petitioners retained their stock in the Douglas Co. Under the circumstances we are of the opinion that the lapse of time is not decisive; and in this connection it may be noted that the act contains no limitation as to time and specifies no time within which an exchange must be made.

We hold that the distribution of new bank stock received by petitioner was received in an exchange of stock in a corporation a party to a reorganization for stock of another corporation a party to the reorganization, in pursuance of a plan of reorganization, and that no gain shall be recognized with respect thereto. Sec. 112 (b), (g), and (h), *supra*. In view of this conclusion it is unnecessary to consider the alternative contention made by petitioner.

The second issue involves a claimed deduction of $12.03 from gross income which was disallowed by respondent for the reason that "it has not been construed that you are engaged in business." The expenditure involved consisted of $11 rental for a safe deposit box in which petitioner kept income-producing securities, $1.03 for registra-

tion fees to the Securities Exchange Commission, and postage paid on the sale of such securities. Petitioner relies on the provisions of section 23 (a) (2) of the Internal Revenue Code.[4] The respondent presents no argument on this issue and it is too obvious to merit discussion, that the claimed deduction of $12.03 should be allowed.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
(a) EXPENSES.—

 \*     \*     \*     \*     \*     \*     \*

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

