Julia S. Dillard v. Commissioner.
Julia S. Dillard v. Commissioner
Docket No. 539.
United States Tax Court
1945 Tax Ct. Memo LEXIS 30; 4 T.C.M. (CCH) 1032; T.C.M. (RIA) 45354; November 28, 1945
*30 Pursuant to a plan of reorganization, a state bank, in 1933, subscribed to and received all of the capital stock of a newly organized national bank, except directors' qualifying shares, and the new bank acquired part of the old bank's assets. Immediately thereafter, the old bank was in control of the new as control is defined in section 112 (h) of the Internal Revenue Code. The stock of the new bank was pledged to the Reconstruction Finance Corporation by the old bank to secure the loan it had received from the R.F.C. and used for the purchase of the new bank stock. In 1939 the R.F.C. released one-half of the new bank stock to the old bank which then distributed it pro rata to its shareholders and reduced the par value of their stock from $100 to $50. The old bank was in process of liquidation at the time. Held, the receipt of the new bank shares by the shareholders of the old bank was an exchange pursuant to a plan of reorganization and no gain is recognizable on their receipt. Section 112 (b), (g) and(h), Internal Revenue Code, as operative during the taxable year. J. Fred Brown, Esq. and Allan Davis, Esq., 1200 Commerce Title Bldg., Memphis, Tenn., for the petitioner. Bernard *31 D. Hathcock, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion The respondent determined a deficiency in petitioner's income tax liability for the taxable year ended December 31, 1939, in the amount of $348.87, which deficiency is based in part on respondent's determination that The transaction whereby you received 38 1/2 shares of the capital stock of the National Bank of Commerce from the Bank of Commerce & Trust Company constitutes a distribution in partial liquidation, and the gain therefrom is taxable as a short-term capital gain. Subsections (c) and (i) of Section 115 of the Internal Revenue Code. Petitioner contests the part of the deficiency based on the transaction mentioned. Other adjustments are not in controversy. Findings of Fact The petitioner is a resident citizen of Memphis, Tennessee. Her return for the period here involved was filed with the collector of internal revenue for the District of Tennessee, at Nashville, Tennessee. Petitioner acquired common capital stock of the Bank of Commerce & Trust Company at the times, in the amounts, and at the costs below stated. No. of Shares
Date Acquired
Cost
32
Dec. 9, 1926
$ 6,200.00
45
May 19, 1927
16,200.00
60
June 2, 1927
21,480.00
94
May 31, 1934
940.00
The *32 Bank of Commerce & Trust Company (hereinafter sometimes referred to as the old bank) is a state banking institution, created and existing under and by authority of the laws of the State of Tennessee. Its offices were located at the southwest corner of Second and Monroe Streets, Memphis, Tennessee. A run on the bank developed in January 1933. To insure payment of its deposits in full, it borrowed $13,000,000 from the Reconstruction Finance Corporation, which loan was secured by a pledge of its assets, and an additional pledge of about $2,000,000 of their own assets by individuals who were directors, shareholders, or depositors of the bank. After the declaration of the "Bank Holiday" in February 1933 the question arose as to whether the bank should reopen, or whether the interests of all concerned would best be served by the organization of a new national bank. A special called meeting of the old bank's board of directors was held on April 27, 1933. The call for and notice of the meeting provided that it was called, "* * * for the purpose of considering and authorizing the organization of a new national bank, subscribing for capital stock therein by the Bank of Commerce & Trust Company, *33 the transfer of the deposits of the Bank of Commerce & Trust Company to the proposed national bank, the transfer of certain assets of the Bank of Commerce and Trust Company to the proposed national bank, to authorize the execution of a Voting Trust Agreement with respect to the stock in the national bank to be subscribed for by the Bank of Commerce & Trust Company, * * * to authorize and approve the making of any and all necessary contracts and agreements with reference to any of said purposes, * * *" At the meeting the board was told by Phil M. Canale, a director and member of a committee appointed to work out a plan for the reorganization of the bank: that the Comptroller of the Currency had approved plans for the organization of a new national bank to be known as the National Bank of Commerce in Memphis, (sometimes hereinafter referred to as the "new bank") with a capital of $2,000,000, consisting of 10,000 shares of common stock of the par value of $100 per share, paid-in surplus of $750,000, and paid-in undivided profits or reserves of $250,000, giving its stock a book value of $200 per share; that the stock of the new bank, with the exception of qualifying shares, was to be subscribed *34 by the old Bank; that the subscription to the stock of the new bank by the old bank was to be financed by a new loan of $2,000,000 to be made to the old bank by the Reconstruction Finance Corporation (hereinafter referred to as the R.F.C.) which was to be secured by pledge of the stock so subscribed for and a third lien on assets of the old bank already pledged to the R.F.C.; and that the new bank was to use the $2,000,000 received from the old bank in payment of its stock subscription, to buy paper and other assets of the old bank held by the R.F.C. as security for its loan to the old bank, which amount was to be then credited against the indebtedness of the old bank to the R.F.C. Canale further stated that in carrying the proposed plan into execution there were many details to be passed upon by the board, among others being that the stock which the old bank would acquire in the new bank was to be placed in a Voting Trust at the request of the R.F.C. and for the purpose of insuring stability and continuity of management for the new bank; and that three of the five Voting Trustees to be selected were directors of the old bank, one was secretary of the R.F.C., and one was manager of *35 the Memphis Branch of the Federal Reserve Bank of St. Louis. The directors were also told by Canale: "that it would also be necessary to consider a resolution authorizing the new bank to take over the deposit liabilities of the old bank, and the transfer to the new bank by the old bank of assets of equal value. * * *; that the ultimat&eownership of the old bank and of the new bank was practically the same, except as to the qualifying shares of the directors of the new bank, which were negligible, amounting to only one hundred and forty shares. * * *; that the Committee had discussed with the Reconstruction Finance Corporation the matter of liquidating the old bank; that as he understood it, the Reconstruction Finance Corporation would permit the old bank to be liquidated in somewhat the same manner in which it was now being liquidated; that it was to be done under the supervision of a committee * * * by selling notes, * * * real estate, etc." Various resolutions were then adopted by the directors, among which were the following: "RESOLVED, that the Board of Directors hereby approve the plan outlined by Mr. Canale with respect to the organization of the new national bank, the liquidation *36 of the assets of the old bank, etc.; that the officers and representatives are hereby authorized and directed to do and perform any and all things necessary or proper to the due and proper consummation thereof. "* * * RESOLVED that the Bank of Commerce & Trust Company subscribe and pay for the entire capital stock of the National Bank of Commerce in Memphis (except the qualifying shares of the directors thereof) amounting to 9860 shares, at and for the price of $200.00 per share. "RESOLVED That the Bank of Commerce & Trust Company deposit the stock to be subscribed for by it in the National Bank of Commerce in Memphis, in a Voting Trust Agreement, with Messrs. W. R. King, W. W. Mallory, Phil M. Canale, the Manager of the Memphis Branch of the Federal Reserve Bank of St. Louis and Secretary of the Reconstruction Finance Corporation, as Voting Trustees, the Voting Trust Agreement to be approved by Messrs. King, Mallory and Canale; and that the officers of this bank be and they are hereby authorized in its name and on its behalf to execute the Voting Trust Agreement as so approved. "RESOLVED That the Bank of Commerce & Trust Company enter into a contract with the National Bank of Commerce *37 in Memphis providing generally that the National Bank of Commerce in Memphis shall assume the deposit liabilities of the Bank of Commerce & Trust Company, after adjustment of off-set deposits, in consideration of the transfer to it of assets of equal amount, consisting of cash and other assets, to be approved by the National Bank Examiner and the directors of the new national bank, the form of agreement so to be entered into to be submitted to the Board for its approval. "RESOLVED that the liquidation of the assets of the Bank of Commerce & Trust Company, according to the plan outlined by Mr. Canale by a committee composed of Messrs. David Sternberg, W. W. Mallory and A. L. Pritchard, be and the same is hereby approved." A special, duly called meeting of the stockholders of the old bank was held the following day, April 28, 1933. The call was for the purposes as set out in the call for the special called meeting of the board of directors as set out above. Phil M. Canale stated to the meeting that subsequent to December 1932 the bank had borrowed thirteen million dollars from the R.F.C. to fulfill the obligations of the bank to its depositors and that such obligation was fulfilled, *38 and that "Immediately thereupon we had a thorough examination made of the bank and set about to see what we could do then to fulfill the next obligation, which was to the stockholders and to the pledgers who had put up their money to insure the payment of the deposits in full." Canale further stated that three directors, including himself, "then set about first, to analyzing the situation in conjunction with the Board of Directors, the officers of the Bank and the stockholders who had large interests in the bank, and as a result of many days and weeks of study, we devised one or more plans whereby we hoped, after taking care of the interests of the depositors and pledgers, to take care of others interested in the bank; that is to say, to take care of the stockholders or this bank and see, if out of an orderly liquidation of the assets of the old bank, and the formation of a new bank to take over the deposits and gradually take over the departments, we could not save the stockholders their investment in the Bank of Commerce & Trust Company. We have had this job constantly since the fifteenth day of January, and we have tried to work out what we believe to be a constructive plan * * *39 * we finally consummated this plan which we now submit to you." After stating that the old bank was to purchase the stock of the new bank with $2,000,000 which the R.F.C. had promised to lend it, Canale further said: "That means that you stockholders are the ultimate owners of the capital stock of the new bank. * * * Except for the qualifying shares of the directors of the new bank, the Bank of Commerce & Trust Company owns all of the capital stock in the new bank. I call your attention to the fact that by reason of this stock ownership, there is, practically speaking, an identity of interests between the old bank and the new bank. "The second thing in which you are interested is the orderly liquidation of the old bank so that it will net the most to the people interested in the old bank, who are the stockholders of the old bank. Of course, the Reconstruction Finance Corporation must be paid, and the assets of this bank must be liquidated in a proper and orderly way, satisfactory to all parties concerned, in order to net the most from the liquidation of the old bank so that its debts can be paid and the equity in its assets turned over to you, as stockholders of the Bank of Commerce *40 & Trust Company. " Canale further stated: "Now in connection with the organization of the new bank, * * *. I think it is almost selfevident to you business men and you business women that some plan is necessary to insure the stability and continuity of management of the new institution. * * * To insure that stability and continuity of management, we have prepared a simple voting trust agreement, under which voting trustees will be selected by the Board of Directors of the old bank to vote the stock in the new bank. Those voting trustees have been designated and approved by the Comptroller's office and the Reconstruction Finance Corporation, * * *. The voting trustees are Mr. King, Mr. Mallory, myself [Directors of the old bank] the secretary of the Reconstruction Finance Corporation and the manager of the Memphis Branch of the Federal Reserve Bank of St. Louis." Canale told the stockholders the names of the 14 directors selected and approved for the new bank, all of which individuals were directors of the old bank. The six members of the new bank's Executive Committee were all directors of the old bank. The new bank was to be called the "National Bank of Commerce in Memphis" and was *41 to take over as many of the employees of the old bank as possible. It was to occupy the old bank premises, using its banking fixtures and equipment, including safe deposit department; and paying $30,000 yearly rental therefor, which rental was to be used to liquidate indebtedness of the old bank. Canale stated further that: "After the new bank is set up, it is proposed that the new bank take over the deposits of the old bank whatever they amount to after off-set deposits have first been adjusted, and as against the deposits assumed by it, the new bank will take over cash and paper approved by the National Bank Examiner and the directors of the new bank so that the new bank will have an equivalent amount of liquid assets against the amount of deposits assumed by it, * * *." Canale also told the stockholders: "So far as the old bank is concerned, that is a matter that will have to be worked out with a great deal of care to conserve its equity in its assets. It is proposed that the old bank be liquidated under the supervision of a Committee * * * The old bank has some seven or eight million dollars of cash on hand to pay its depositors and the new bank will of course take over this cash *42 against deposits of the old bank, and it is proposed that the new bank will purchase as much of the assets of the old bank as the National Bank Examiner and the directors of the new bank may approve. The money so paid over to the old bank for paper and bonds held by it, will go to liquidate its debts to the Reconstruction Finance Corporation." In reply to an inquiry from a stockholder as to what was going to be done for the old stockholders, Mr. Canale said, "Answering your question, I wish to call to your attention, first, that we owe debts. Until the corporation pays its debts, it has merely an equity in its assets. Those assets will have to be liquidated in an orderly manner. The bank gets rid of a lot of its debts and a corresponding amount of its assets when the deposits are turned over to the new bank. When the rest of the assets are liquidated and the creditors are paid off, what remains will be distributed to the stockholders." The stockholders then adopted resolutions providing for the subscription and payment for the entire capital stock of the new bank, except qualifying shares, for the borrowing of the $2,000,000 from the R.F.C., and finally adopted the following resolution.. *43 "RESOLVED That the stockholders approve the proposed plan, as discussed and outlined at this meeting, and that the directors be and they hereby are authorized to fully consummate the same and to authorize the officers of the bank to execute any and all necessary contracts and generally to do and perform any and all things incident or necessary to the full and proper consummation of the plan outlined and discussed at this meeting." The new bank was organized in May 1933, and the old bank subscribed and paid for all of its stock, except the qualiiying shares, required to be held by the new bank's directors. Also, in May 1933 the old bank transferred certain of its assets to the new bank in consideration of the assumption by the new bank of the liabilities of the old bank to its depositors in pursuance of the plan of reorganization and immediately thereafter the old bank was in control of the new. That the stock in the new bank should ultimately be distributed to the stockholders of the old bank was intended to be, and was, a part of the plan of reorganization. The affairs of the old bank have since been handled by its Liquidating Committee, which has been gradually liquidating its assets, *44 paying off its obligations, and endeavoring through orderly business procedure to salvage as much as possible for its stockholders. A special called meeting of the board of directors of the old bank was held on July 24, 1939, at which meeting A. L. Pritchard, the chairman of the Liquidating Committee, read a letter received from the R.F.C., dated July 21, 1939, consenting under certain conditions to release 50 per cent (4,910 shares) of the capital stock of the new bank held by the R.F.C. as collateral to the old bank's indebtedness to the R.F.C. Appropriate resolutions were adopted to enable the bank to comply with the condition imposed by the R.F.C. for the release of the 4,910 shares of stock in the new bank. The directors also adopted the following resolution: "(5) RESOLVED, that, upon compliance with the provisions of Reconstruction Finance Corporation, set forth in said letter of July 21, 1939 and the release from pledge of 4910 shares of the capital stock of National Bank of Commerce in Memphis, there be distributed on September 1, 1939, in partial liquidation to stockholders of record of Bank of Commerce & Trust Company as of 2:30 P.M., July 24, 1939, one (1) share of the capital *45 stock of National Bank of Commerce in Memphis for each six (6) shares of stock held by such stockholder of Bank of Commerce and (sic) Trust Company, and scrip representing a fractional participation of one-sixth (1/6) of a share of the capital stock of National Bank of Commerce in Memphis for each one share (1) of stock of Bank of Commerce & Trust Company not aggregating six (6) shares or multiples thereof, which scrip shall be in such form and shall contain such conditions as the Executive Committee may authorize, provided, however, that any holder of such scrip aggregating one (1) share of stock of National Bank of Commerce in Memphis, or multiples thereof, shall be entitled to exchange such scrip for shares of stock in National Bank of Commerce in Memphis." On August 11, 1939, the board of directors of the old bank held a special meeting at which there was unanimously adopted a resolution, the preamble to which read as follows: "WHEREAS, to comply with the conditions set forth in the letter of July 21, 1939, addressed to A. L. Pritchard, Chairman of the Liquidating Committee, by Reconstruction Finance Corporation; and to carry out the distribution in kind in partial liquidation *46 to stockholders of this corporation of 4,910 shares of the capital stock of the National Bank of Commerce in Memphis, it is necessary to reduce the capital and authorized capital stock of this corporation, as hereinafter set out." The resolution then provided for the reduction of the par value of the old bank's 30,000 shares of stock from $100 to $50, per share, and the transfer of $1,500,000 from capital to surplus. The charter was to be amended accordingly, and "upon the capital and capital stock being reduced and the charter amended, as above provided, a distribution in kind of 4,910 shares of the capital stock of National Bank of Commerce in Memphis will be made pro rata to the stockholders of the Bank of Commerce & Trust Company of record at 2:30 p.m., July 24th, 1939." On August 22, 1939, a special meeting of the stockholders of the old bank was held, at which they ratified and approved the action taken by the board of directors at the meeting held August 11, 1939, and adopted a resolution reducing the par value of the old bank's shares from $100 to $50 per share, and amending its charter so that its capital was reduced to $1,473,000 after the cancellation and retirement of 540 *47 shares of treasury stock. The resolution further provided for the pro rata distribution to the stockholders of the old bank, of the 4.910 shares of new bank stock released by the R.F.C.
Shortly after August 22, 1939, the stockholders of the old bank, including petitioner, deposited their stock certificates evidencing the stock of the old bank with the Trust Department of the old bank. Each certificate was stamped with a rubber stamp to the effect that the bank's capital had been reduced from $3,000.000 to $1,473,000 and that the par value of the stock was $50 per share. The certificates were then returned to the stockholders, together with the shares of stock in the new bank which they were entitled to receive as part of their pro rata distribution in kind of that stock. On or about September 1, 1939, petitioner, as owner of 231 shares of old bank stock, received 38 1/2 shares of stock in the new bank as her share in this distribution. At that time this stock had a fair market value of approximately $270 per share. Of these 38 1/2 shares of stock in the new bank, 15 2/3 shares, (the only shares in issue) having a value of $4,230 were received by petitioner with respect to the 94 shares *48 of stock in the old bank acquired by her May 31, 1934 at a cost basis of $940. The distribution of stock in the new bank made in 1939 by the old bank to its stockholders was made under the direction of A. L. Pritchard, a director and Chairman of the Executive Committee of that bank, in pursuance of the plan adopted in 1933 which, as he understood it, was for all the stockholders of the old bank to become stockholders of the new bank to the extent of the shares they had in the old bank. There have been no further distributions of stock in the new bank to stockholders of the old bank, and the latter still owns about 5,045 shares of stock in the new bank. There is no present plan to distribute the remaining stock in the near future, but the old bank expects to ultimately distribute all of it to its stockholders. As of July 24, 1939 the balance sheet of the old bank disclosed a Surplus and Undivided Profits deficit of $28,722.35. Its balance sheet as of August 22, 1939 showed a Surplus and Undivided Profits credit of $51,136.02. This credit was largely the result of the old bank reestablishing a loan of "some sixty-odd thousand dollars" as an asset on its books, which loan had been charged *49 down to $1 some years before. As of August 23, 1939, the old bank was still indebted to the R.F.C. in the amount of $1,989,000, secured by pledge of the stock it owned in the new bank. In the old bank's statement of condition as of that date, appears the following "Note": "Liability for accrued interest on Bills Payable, amounting to $444,510.58, is not reserved for. Of this amount, $443,558.51, is due on additional $2,000,000.00 loan secured by stock in National Bank of Commerce in Memphis * * *" A plan of reorganization was adopted by the old bank in 1933 and pursuant thereto the stock in the new bank here involved was distributed to petitioner. Opinion TYSON, Judge: Petitioner contends that she received the shares of stock in the new bank in exchange for her stock in the old bank made in pursuance of a plan of reorganization, and that, consequently, no gain or loss is to be recognized from the transaction under section 112 (b) (g) and (h) of the Internal Revenue Code[1] *51 as operative during the taxable year. In the alternative, petitioner contends "that the capital stock reductions and/or distributions were capital distributions within the meaning of Sec. 115 (d) of the Internal Revenue Code." *50 [2] *52 Respondent contends that the distribution to petitioner by the old bank in 1939 of shares of stock in the new bank constituted a distribution in partial liquidation of the old bank under section 115 (i) of the Internal Revenue Code, [3] and that consequently there was a gain of $3,290 realized by petitioner therefrom, which gain is taxable as a short-term capital gain in accordance with the provisions of section 115 (c) of the Internal Revenue Code. More specifically, the respondent contends that *53 the distribution was one "in partial liquidation" under the second of the two forms of partial liquidation defined by section 115 (i), supra, viz.: "one of a series of distributions in complete cancellation or redemption of all or a portion of its stock", and, as supporting this contention, points out the various expressions shown in the minutes to the effect that the old bank was to be liquidated. The facts here are in all essential particulars identical with those in W. N. Fry, 5 T.C. 1058 (No. 130), on a like issue, and under authority of that case we hold that the distribution of new bank stock received by petitioner and here in issue was received in an exchange of stock in a corporation, a party to a reorganization, for stock of another corporation a party to the reorganization, in pursuance of a plan of reorganization, *54 and that no gain shall be recognized with respect thereto. Section 112 (b) (g) and (h), supra. In view of this conclusion it is unnecessary to consider the alternative issue raised by the Decision will be entered under Rule 50. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. (b) Exchanges Solely in Kind. - * * * * *
(3) Stock For Stock On Reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * * * *
(g) Definition of Reorganization. - As used in this section (other than subsection (b) (10) and subsection (1)) and in section 113 (other than subsection (a) (22)) - (1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, or (E) a recapitalization, or (F) a mere change in identity, form, or place of organization, however effected. (2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another. (h) Definition of Control. - As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation. ↩
2. SEC. 115. DISTRIBUTION BY CORPORATIONS. * * * * *
(d) Other Distributions From Capital. - If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend.↩
3. [Section 115 (i) of the Internal Revenue Code] (i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩