National Bank of Commerce in Memphis v. Commissioner.
National Bank of Commerce v. Commissioner
Docket No. 32896.
United States Tax Court
1953 Tax Ct. Memo LEXIS 56; 12 T.C.M. (CCH) 1324; T.C.M. (RIA) 53367; November 24, 1953
W. G. Boone, Esq., 1325 Commerce Title Building, Memphis, Tenn., and W. G. Boone, Jr., Esq., for the petitioner. A. Robert Doll, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in excess profits tax as follows: Year
Deficiency
1943
$ 3,347.88
1944
3,371.88
1945
14,571.10
The first issue involves a determination of the basis of certain property in the hands of petitioner. For the second issue, the propriety of an addition to a bad debt reserve is raised. Findings of Fact The National Bank of Commerce in Memphis is a corporation organized under the laws of the United States of America with its principal place of business in Memphis, Tennessee, and its returns were filed with the collector of internal revenue at Nashville, *57 Tennessee. Petitioner is the successor to the Bank of Commerce and Trust Company, a state banking institution, which was organized and operated under the laws of Tennessee. The Bank of Commerce and Trust Company will hereinafter be referred to as the "old bank", and the petitioner as the "new bank". In 1933 the old bank was beset with difficulties growing out of the general business depression of the era. The stockholders and directors of the old bank sought and obtained financial assistance from the Reconstruction Finance Corporation to meet the emergency, and the assets of the old bank were pledged to R.F.C. as security for the loans. After the bank holiday in February 1933, the question arose as to whether the bank should reopen or whether the interests of all concerned would be best served by the organization of a new national bank. The stockholders and directors of the old bank decided to liquidate the old bank and organize another bank. A special meeting of the directors of the old bank, on or about April 27, 1933, was called for the purpose of considering and authorizing the organization of a new national bank, and to pass on any and all matters incident or necessary to *58 the organization of this new bank. At this meeting the chairman of the reorganization committee told the directors that the Comptroller of the Currency had approved plans for the organization of a new national bank to be known as the National Bank of Commerce in Memphis. Among the many items discussed by the chairman was one concerning the rental arrangement between the old bank and the new bank. He stated at the time it was not proposed that the new bank take over the bank building of the old bank, but it should merely lease suitable banking quarters for the new bank. The new bank was to pay the old bank a rental of $30,000 per year. This plan had been recommended by the Director of R.F.C.; it was approved by the directors of the old bank and later by the stockholders. Shortly after the special meeting a charter was obtained for the new bank, and it was organized and opened for business on May 1, 1933. The authorized capital stock of the new bank had a book value of $2,000,000. All of the stock, excepting the qualifying shares of the directors, was subscribed and paid in cash by the old bank. The $2,000,000 which was paid by the old bank to the new bank for its stock was borrowed *59 by the old bank from R.F.C. under an arrangement whereby the stock in the new bank was pledged as collateral to R.F.C.
The new bank leased from the old bank the bank building and fixtures at a rental of $30,000 per year. This arrangement continued without essential change until 1937 when the new bank acquired the bank building and fixtures. After the transfer the old bank paid to the new bank a yearly rental of $3,000 for the use of office space in the new bank. The bank building and fixtures, which are the subject of this proceeding, were included in the assets pledged by the old bank to R.F.C. In 1937 R.F.C. agreed to reduce, and then release its lien on the bank building and fixtures, and it further agreed to the transfer of the building and fixtures to the new bank upon the payment of $950,000 by the new bank on the old bank's indebtedness to R.F.C. The legal formalities for this transaction were completed by the parties. In January 1937 the directors of the old bank authorized the transfer of the building site, bank building and fixtures to the new bank. The transfer was effected by warranty deed and payment was made by a $950,000 cashier's check of the new bank drawn on the *60 Federal Reserve Bank and payable to "Yourselves". The proceeds of this check were credited by R.F.C. to the indebtedness of the old bank without going through the old bank's accounts. On January 9, 1937, at the time of the transfer of the bank building and fixtures to the new bank, the adjusted cost basis of these assets in the hands of the old bank was $1,666,297.74. In 1928 the old bank charged off $284,000 for the demolition of buildings located upon the property where the bank building was erected. This sum was not included in the adjusted basis of $1,666,297.74. In the 1937 tax return of the old bank a capital loss of $340,534.49 was reported as a result of the sale of the building and fixtures. The aggregate capital loss shown on the return was $394,668.78. The 1937 return disclosed a capital loss deduction of $4,920. The net income shown on the tax return for the year 1937 after deducting the $4,920 was a loss of $47,275.23. Petitioner claimed depreciation for the years 1937 through 1941 on the basis of $950,000 as the cost of the bank building and fixtures. The allocation of the $950,000 between the land and building for depreciation purposes and as used on the returns *61 was $727,250 for the building and $222,750 for the land. The bank building is of the monumental type, constructed of granite, Bedford stone and concrete. It occupies a quarter city block, 148 feet by 148 feet in size. It has a complete basement in which the valuts are located, as well as a cafeteria and power plant. The banking rooms are on the first floor; the transit and cotton departments on the second floor, and the third floor is used for storage. The structure is completely air conditioned and is equipped with two elevators. In 1939 the new bank sought to reduce the indebtedness of the old bank to R.F.C. and thereby effect a release of a portion of the collateral pledged by the old bank with R.F.C. In that year it effected the release of 4,910 shares of stock of the old bank and a pro rata distribution was made to the stockholders of the old bank. There was likewise a distribution of 4,910 shares of new bank stock to the stockholders of the old bank. This stock distribution resulted in litigation before the Tax Court. In W. N. Fry, 5 T.C. 1058, and Julia S. Dillard, a Memorandum Opinion of this Court, entered November 28, 1945 [4 TCM 1032,], the *62 Court found that a plan of reorganization was adopted by the old bank in 1933, and that the stock in the new bank was distributed in accord with the plan. There was another stock liquidation of the old bank in 1946, and its charter was surrendered on March 17, 1947. The trust department of the old bank, which was one of the largest in the community, held assets in 1933 valued in excess of $34,000,000. After the new bank acquired authority to do a trust department business, the trust accounts of the old bank were transferred to the new bank. The transfers took place at various times from 1933 to 1947 and involved about $20,000,000 in trust assets. No money consideration for the transfer of this business was paid by the new bank to the old bank. The reorganization of the Bank of Commerce and Trust Company was successful. All depositors were paid in full and the net equity in the assets of the old bank, as well as the banking business and other activities of the old bank, were preserved for the stockholders. On March 26, 1945, petitioner filed a claim for refund of income taxes paid for the calendar year 1941. Petitioner contended that it was entitled to use a greater depreciation *63 base for the bank building and fixtures. Petitioner urged in its claim that the building was acquired in connection with a reorganization and for that reason it should have the same basis for depreciation in the hands of the transferee as it had in the hands of the transferor. Respondent denied this claim and petitioner filed suit in the District Court for the Western Division of Tennessee, National Bank of Commerce in Memphis v. United States, 87 Fed. Supp. 302. Petitioner's complaint stated that "This action arises under Sections 23, 112, 113, and 114 of the Internal Revenue Code." In the opinion of the District Court, Judge Darr found the contentions of the parties as follows: "The New Bank makes the claim that the transfer of the building and other physical properties was a step in the unitary plan of reorganization. Therefore, the New Bank contends that by reason of the provision of section 112 (b) (4) of the Internal Revenue Code as modified by section 112 (e) (26 U.S.C.A. sec. 112 (b) (4) and 112 (e)) no loss from the exchange should have been recognized. The New Bank also claims that the *64 same result is reached by the application of section 112 (b) (3) and (5) as modified by section 112 (e) (26 U.S.C.A. secs. 112 (b) (3) and (5) and sec. 112 (e)). "The defendant's position is that the transfer of the property was a sale for cash and the basis of value for tax purposes was the cost to the New Bank as determined by the Commissioner." The court resolved these contentions in the following manner: "I reach the conclusion that there was a reorganization of the Old Bank into the New Bank and that the New Bank was a party thereto under the provisions of section 112 (g) (1) (D) and section 112 (g) (2) of the Internal Revenue Code (26 U.S.C.A. sec. 112 (g) (1) (D) and sec. 112 (g) (2)). "But I am of the opinion that the transfer and acquisition of the banking house and equipment was a sale for cash and a transaction to be separately tested against the statutory provisions. This particular transaction, therefore, was not within the scope of a statutory reorganization, but was a sale for cash, the cost price being the basis for tax purposes. "This view was the position taken by both banks as evidenced *65 by the fact that the transaction was recorded on their books and records as a sale and the Old Bank on its sworn income tax return for 1937 reported a loss from the sale. The same control was in charge of both banks and now the same controlling authority has reversed its position in this litigation. "It would seem that the New Bank's claim in this case would be under section 112 (b) (4) as modified by section 112 (e), but if it be that the provisions of section 112 (b) (3) and (5) as modified by section 112 (e) are applicable to the facts, the New Bank's position cannot prevail for the same reasons above indicated. * * *
"The New Bank also makes claim for the same relief based on section 113 (a) (8) (26 U.S.C.A. sec. 113 (a) (8)). The New Bank has not pressed this point either in brief or argument and it is sufficient to say that the property here must be treated as merely an asset used in a trade or business and not as paid-in surplus." The court's conclusions of law are as follows: "2. "There was no plan of reorganization of the old bank which contemplated or included the transfer of its bank building and equipment to the plaintiff. "3. "The *66 transfer and acquisition of the bank building and equipment was a sale for cash and the cost price to the plaintiff of $950,000 is the proper basis for depreciation for tax purposes. "4. "The issues should be decided in favor of the defendant and cause dismissed at plaintiff's costs." On appeal, the United States Court of Appeals, in 180 Fed. (2d) 356, affirmed the judgment of the Tax Court for the reasons stated in the opinion of the District Judge. The Supreme Court denied certiorari, 340 U.S. 822. The transfer of the bank building and fixtures in 1937 from the old bank to the new bank was a sale for cash, and the basis of the bank building and fixtures in the hands of the new bank was its cost, or $950,000. Respondent explained an adjustment to petitioner's 1945 net income as follows: "(b) It has been determined that your reserve for bad debts for the taxable year December 31, 1944, is ample for your needs, based on past experience, and that you are not entitled to increase your bad debt reserve by $8,669.39, and your income is increased in the amount of $8,669.39 for bad debts deducted on the return." Opinion In this first issue petitioner *67 contends that it acquired its building and fixtures in 1937 in one or more of the following ways: (1) in connection with a reorganization within the meaning of section 113 (a) (7), I.R.C., (2) as the result of a transfer to a corporation solely in exchange for stock or securities in such corporation, controlled by the transferor in a transaction contemplated by section 112 (b) (5), or (3) as paid-in surplus under section 113 (a) (8). Now as a result of its acquisition under one of the above sections of the Code, petitioner maintains that it is entitled to use for the purpose of computing depreciation and invested capital the adjusted basis of the building and fixtures in the hands of the old bank, and it further maintains no loss was allowable on the exchange or transfer. With regard to the basis of the bank building and fixtures petitioner contends that the basis as reflected on the books of the old bank should be increased by $284,000, an amount erroneously charged off the old bank's books in 1928 for demolition of buildings located on the property where the bank building was erected. On the other hand it is the position of the respondent that under the *68 judgment of National Bank of Commerce in Memphis v. United States, 87 Fed. Supp. 302; affd., 180 Fed. (2d) 356; certiorari denied, 340 U.S. 822, the doctrine of res judicata or collateral estoppel is applicable, and petitioner can not again litigate the questions relating to depreciation and additional capital investment. Respondent also contends, alternately and on the merits, that the transfer and acquisition of the bank building and equipment was a sale for cash and the basis for the new bank is its cost price to the new bank. Petitioner objects most vigorously to respondent's contention that res judicata or collateral estoppel apply to this proceeding. However, despite its protestations no one can alter the fact that the controlling factual element in dispute in this proceeding and in the former proceeding before the District Court was the sale of the bank building and fixtures in 1937. Neither changes in the law, nor decisions of the courts can alter the factual and the historic sale of the building in 1937. Granted that the effects of the sale may be varied by changes in the law subsequent to 1937, the sale itself will be unaltered. Notwithstanding *69 the conclusions of the District Court, we have circumspectly reviewed the record before us, and our conclusion as to the transfer of the building is the same as that reached by the District Court in its decision in National Bank of Commerce in Memphis v. United States, supra.The transfer was a sale for cash and the basis of the bank building and fixtures in the hands of the new bank was its cost, or $950,000. We agree with petitioner that the reorganization of the old bank was in continuous process from 1933 through 1945, see W. N. Fry, 5 T.C. 1058, but this does not mean that every transaction of the two banks, either jointly or severally, was part of the planned reorganization. The reorganization as planned in 1933 did not specifically include the transfer of the building and fixtures. The fact is that the men responsible for the reorganization planned that the new bank would be a lessee rather than a purchaser of the building and fixtures. As a lessee, the new bank would not have its assets tied up in real property, but would be in a more liquid position and better able to meet the demands of its depositors. They knew that the new bank could not pay *70 depositors with real property, and that a strong cash position must be maintained. Probably the officials and the directors of both banks thought of the day that the new bank would own a building, but they did not, in planning the reorganization, concern themselves with the transfer of the building and its fixtures. They were concerned with the acquisition of capital for the new bank, in transferring accounts, in taking care of a collateral title and abstract business, and in transferring the trust assets of the old bank to the new bank. The problems concerned with these activities were foremost in their minds. It was only after the new bank demonstrated its ability to weather the period of the middle thirties and there was a surplus with approximately one million dollars in cash that these men could plan and effect the transfer of the building and fixtures. Nowhere in the record that was made contemporaneously with the planning of the reorganization do we find evidence that conflicts with our conclusion as to the sale of the building and fixtures. Our conclusion, however, does conflict with the record that was made after the sale, that is, the testimony of some of the men involved *71 in the transaction. However, this part of the record is not convincing and we find the facts as to the sale as stated above. The same conclusion was reached in National Bank of Commerce in Memphis v. United States, supra.Cf. Tennessee, Alabama & Georgia Ry. Co. v. Commissioner, 187 Fed. (2d) 826; affirming 13 T.C. 486. Petitioner, under one of its contentions, relies on section 113 (a) (7) of the Code. Since the bank building and fixtures were not acquired "in connection with a reorganization", petitioner's basis in the property is not determined by section 113 (a) (7). Petitioner's second contention, that the building and fixtures were acquired in a transaction described in section 112 (b) (5), is likewise without merit. The building was acquired upon the payment of a check in the amount of $950,000, and it was not an exchange solely in kind. If petitioner is to prevail under its third contention on the first issue, that the transfer of the building and fixtures comes under section 113 (a) (8), the evidence must support a finding that the new bank acquired the building and fixtures as paid-in surplus or as contribution to capital. The *72 record does not sustain such a finding. The most that can be said, and it only from the testimony after the sale of the building and fixtures, was that the building and fixtures were worth more than the $950,000 which the new bank paid. There is no suggestion contemporaneous to the transaction that part of the consideration for the building and fixtures was a stock issuance or an addition to paid-in surplus. Petitioner maintains that the basis of the bank building as reflected on the books of the old bank should be increased by $284,000, which is the sum that the old bank charged off in 1928 on the demolition of a building located on the property where the bank building was to be erected. Petitioner has failed to show, nor can we see, how this affects the cost basis of the building and fixtures in the hands of the new bank. The basis of the building and fixtures in the hands of the new bank is dependent upon the cost of the building and fixtures to the new bank. This cost, and therefore the basis, was $950,000. Now to consider the second issue. Petitioner objected to the adjustment which respondent made to its 1945 bad debt reserve, and contended that the claimed addition in the *73 amount of $8,669.39 to the bad debt reserve for the year 1945 was reasonable and proper. At the hearing petitioner produced an exhibit which allegedly showed the old bank's and the new bank's yearly outstanding loans, bad debts charged off, bad debt recoveries, and net charged off or recovered; the exhibit also contained figures representing the new bank's reserve for bad debts. The exhibit in itself, and that is the only evidence presented on the issue, is not sufficient to prove the property of the claimed addition to the reserve for bad debts. Petitioner has not shown that the bad debt reserve of $102,054.94 was inadequate and that it required the addition of $8,669.39. The schedule submitted by petitioner reveals that for the three years preceding 1945 the bad debt recoveries exceeded the bad debts charged off. Petitioner has attempted, on brief, to demonstrate that it is within the provisions of Mim. 6209, 1947-2 C.B. 26. However, the provisions of this mimeograph apply to tax years beginning after December 31, 1946; the year before us is 1945. The petitioner has failed in its burden and the respondent must be sustained. Decision will be entered for the respondent. *74